66 IGT v. ALLIANCE GAMING 66 IGT v. ALLIANCE GAMING Good afternoon, Your Honor. As it pleases the Court, Alliance contends that this report erred when it reversed its prior two holdings and found that there was not substantial evidence by which a jury could find that real games are a relevant antitrust market. And I think it's clear from the record that there is ample evidence showing that real games are in fact a relevant antitrust market. To begin with, the standard, the SNF, which is a small but significant non-transitory increase in price, which hopefully you'll indulge me and allow me to call that SNF so I don't have to continue to repeat the typical version there. SNF is met here based on multiple statements in the record by ITT themselves and also based on the evidence that was reviewed by Bali's expert, Dr. Adams. When IGT was looking for high patent damages in connection with its patent infringement claim, which I believe this Court has some familiarity with, previously they had ruled that those patent scores affirmed the lower court holding on those patents. When it faced the high damages award, it sought price erosion damages, for example. And what IGT said in that instance was, for every time that Bali sold a real game, there would be a drop in prices in IGT's sales of its own real games. And in fact, they specifically cited... I have a question. I'm going to ask this of the other side as well because it pervades both sets pretty well. I'll ask it now and then I want you all to address this maybe after the argument. There's a lot of material here marked confidential, and you're right now going into some of it. So I want to know from you all how much of that we are going to be able to address in any opinion that we might issue of how much of it is not really seriously asserted as confidential and how much is. But let's pass that for now and go directly to your argument. Sure. I'm happy to address that later whenever you would like. That's fine. So there's evidence in the record of price erosion that IGT saw in connection with its patent damages claim. And in addition to that, Bali's damages expert looked at the evidence and found significant evidence of price erosion across the board. And what that means is that IGT, when it was a real game monopolist, was able to charge super competitive prices. The record is replete with examples from their head of sales, Ron Rivera, for example, saying we never had to lower our prices before, Bali now has a real game, we had to lower our prices. The real game... Let me ask you two questions. One, first, your opposing counsel will, I expect, say, based on the brief that the Unitherm case demonstrates that the lost profits type analysis is not functionally equivalent to the relevant market analysis. A, do you agree with the proposition? And B, do you think that Unitherm stands for that proposition? I disagree on both counts. First, I think that Unitherm does not stand for that proposition. I think that Unitherm, at best, is saying that, and I think the case that you're thinking of that they're referring to is actually the cohesive text case. It's what they cite, I believe, for the proposition that you look at, that the technological analysis is what you look at when you're talking about lost profits in the patent case, not an economic analysis. Well, Unitherm has language that talks about the party having introduced evidence of technological substitution or non-substitution versus economic substitution. Cohesive, I think, has similar language. And green processing, I think, addresses both when it says that actually you do look to the economic substitution as well. Green processing is a lost profits case. It has nothing to do with relevant market as such. It's not an antitrust case. Right. So the question is, is one of equivalence. Are these two analytical constructs equivalent in all material respects and are the differences merely differences of nomenclature or are there differences of substance? That's really the question. I think there is not actually even a difference. I think what is happening here is that there might be cases in which in a lost profits analysis you would look at the technological substitution of substitutability and potentially the economic substitutability. I don't think in all cases you have evidence of both. You'd have to have. Otherwise, if there's no economic consequence to the technological difference, then you'd say no lost profits. That's green processing. Right. Exactly. And the point is that you're always talking about damages here. Of course there's an economic component to that. And factually, the issue that I take with ITT's argument is that they make the statement that what Troxell, their expert, was talking about was technological substitution when he was an accountant and he was opining on things like competition and substitutability from an economic standpoint. And ITT's inerogatory responses are talking about the lost sales. We're not talking about a situation where factually their admissions go to technological substitutability regardless of what the standard is in the case by which we contend green processing supports and also unicorn supports. You still look at the economic substitutability, absolutely. But isn't there a difference between the analysis that normally occurs in a lost profits case with whether there are substantial non-infringing alternatives and the issue that you need to address in a market determination of whether there's cross-elasticity, the impact of the monopolist raising prices on elasticity, which is a somewhat different question, is it not? I would agree that in some instances the lost profits question in the patent context can be more nuanced. Here the point is that ITT overreached in its lost profits case by saying there was a one-for-one substitutability. They didn't say there are no adequately acceptable technological substitutes or the like. They said there is nothing that competes but Valley's wheel game, one-for-one. In addition, addressing the cross-elasticity question that you have, I agree that that is part of the analysis, which is why you have to look at what Dr. Adams submitted, which is the SNP test, which as you see from the price erosion, which is different than the lost profits question, also clearly demonstrates that there was a market. So there's a wide range here in the record of evidence of economic substitutability and economic evidence that supports that a jury could rely on to find that there was a market here. Do you think that price erosion is, again, effectively the same as or at least parallel to the question of what's the term that we've been using for demonstrating relevant market? The SNP standard? Yeah, well, the SNP standard, which demonstrates, now I've forgotten the term. The cross-elasticity. Yes, of course, cross-elasticity of price. Do you think those are functionally similar inquiries? I think that the flip side is the same point. I think that what is happening, if you look at the cases, and if you see the page 9 of Valley's reply brief in footnote 2, we cite a host of cases that say you don't have to do cross-elasticity. And because of that, it's a very hard analysis to do with a ton of data that you have to go out and get to show. When here, if you have some clear price erosion data that demonstrates SNP is met, then you're able to demonstrate that there was a super competitive price that was being offered in the market, being sought and obtained by the monopolist. And then when somebody enters the market, you show that that price decreases. That evidence is the flip side of cross-elasticity. You say there's a ton of cases. You cited Whole Foods in Geneva in that proposition. Are there others that we should be looking at that stand for the proposition that you don't need evidence of cross-elasticity but price erosion is enough? Yes, if you look at page 9 of our reply brief, we actually cite, I don't know if you want me to read all these to you, but you do on footnote 2 of the brief. In fact, there's quite a few. I think we cite 1, 2, 3, 4, 5, 6, 7, 8 cases alone, and it's just this footnote that supports the concept that cross-elasticity does not necessarily need to be reached in order to demonstrate that there's a market, that the SNP test is what's accepted by the horizontal merger guidelines and adopted by the uniform case. To what extent do you have to demonstrate price erosion with respect to your argument about the market? The standard that has been adopted by the horizontal merger guidelines is 5%, and that shows that there's a 5% decrease in the price. Here, our expert, Dr. Adams, submitted a report, which IGT actually ignored in its opposition, showing that IGT wheel game prices fell from 5.9% to 14.7%, which is a very significant decline directly attributable to Valley coming in with the wheel game. I think it's important to note that that is taken in the context of their experts and their interrogatory and their backwitnesses saying it's a one-for-one replacement. It is even stronger evidence. I'm actually out of time. If you don't have any questions, I want to save some time for my rebuttal. Sure. Yes, we'll save the rest of the time for rebuttal. Thank you. May I please report? My name is Deanne Maynard, and I represent the appellee IGT. The district court correctly concluded that there is no jury question here as to whether or not wheel-shaped bonus games, as opposed to games of any other shape with or without a bonus, are a separate antitrust product market. Valley's evidence essentially boils down to two things, neither of which is sufficient to get to the jury on this question. One, our evidence of lost profits or Panduit damages evidence, and two, their experts' testimonies of an alleged price drop after their entry into the market. Neither of those, at best, both of those simply show that the Monte Carlo wheel game and Valley's wheel game and our wheel game and other wheel games are in the same market. But they don't put boundaries around the market, which is what's required under the Supreme Court's test to establish a separate antitrust market. So, with respect to our lost profits analysis, to go to your question, Judge Bryson, about Unitherm. Unitherm says that I don't think this court has to hold that Unitherm holds as a blanket matter that no Panduit inquiry would ever, depending on what the evidence was, establish an antitrust market. But what Unitherm does establish is that Panduit evidence, to which they point in this record, is not enough. Our experts... How do you... In what respect do you think Unitherm says that? I read that portion of Unitherm carefully, and I think to me that the evidence in that case was much weaker than the evidence here. The evidence with respect to our damages experts' testimony is essentially analogous to the evidence in that case. So the evidence in that case... I take issue with counsel's description of the case. I think that evidence in the Unitherm case was also economic evidence. The Panduit inquiry is an economic inquiry. It's a different economic inquiry, though. It's an inquiry into whether the patented product and the infringing product would have an exchange out one-to-one. And so in the Unitherm case, what happened in that case, ironically enough, was about a golden-brown color. Here we have shapes, there we have colors. That process there created a golden-brown color on cooked meat. And what their expert was saying was an antitrust market was processes that create that golden-brown color, and that that was itself a relevant antitrust market and defined the market by the patented feature, the golden-brown process color. The golden-brown color process that created the golden-brown color. That's exactly what our damages expert did here. All he did, he testified in his deposition, it's at A13520, that he did not do a cross-elasticity analysis, our damages expert, our Panduit damages expert. He said, if I were to do that, I'd have to consult an economist. But even though there was no technical, formal cross-elasticity analysis, is the evidence relating to the Panduit fact is nonetheless an issue that has some bearing on the market determination? Yes, Judge Lin, it could have some bearing, but it isn't sufficient... We're talking about summary judgment here, and the question is whether there's enough to raise a genuine issue of material fact. Right, and it would be relevant, I would say, but it isn't sufficient to get into a jury, and they don't have enough to get you to a jury here. I mean, under the Supreme Court test, Matsushita, expert testimony alone isn't enough to get you there, especially when you're talking about something that's really implausible, like here. There's a wheel-shaped market. Here's the thing that bothers me about the inquiry into implausibility. I mean, normally we assume consumers are rational. They make rational decisions on economically rational grounds. But we're dealing with an industry here that appeals to, not, well, with apologies to the industry representatives that may be here, to the less rational aspects of human behavior. Those are the people that respond to bells and whistles, and will put large amounts of money into a machine because it makes a lot of noise. So I'm not sure that saying, well, just a wheel is silly. I mean, what's the difference between a wheel and a square? Well, the evidence is that to at least the kinds of folks that frequent casinos, if it does make a difference, and if that difference is demonstrated by something like price erosion, it seems to me it's not something you can readily dismiss as kind of silly. Well, a couple of responses. One, the relevant consumer here is the casino. Well, the casino is responding to the customer. And so I don't think you can really say, well, the casinos are rational actors. Of course they are, but they're rational actors dealing with, if I may, an irrational set of purchasers, and they are keenly aware of the particular features of that irrationality and they take advantage of it. So I don't think you can shield the irrationality, perhaps, of liking a wheel by saying, well, but casinos are rational. Even if one takes the Massachusetts inference out of it, there still isn't sufficient evidence here to get to a jury because at most all they've shown is that wheel games are in the same market with other wheel games. What they haven't shown, Judge Bison, is they have no evidence suggesting that if the price of wheel games were to rise by a small but significant non-transitory amount, that casinos wouldn't shift to tower bonus games or square bonus games or any other bonus games that are pictured in our briefs. And that's the kind of evidence that they would need to establish an anti-trust market for a jury to conclude, for you to let this go to a jury to find that there is a separate market for wheel games. Going back to the Panduit analysis, the evidence our expert offered, our expert on Panduit offered, is exactly analogous to the Uniform Testimony there because all he did was he testified in his deposition, this is all he did. I looked at every time a casino had bought a valley wheel game and I decided that would have been a lost sale. He was told there were no non-infringing substitutes and so he just said, I counted that as a vote for a wheel game and that that would have been a wheel sale. Now, that may not have been a successful Panduit theory if it had ever gotten to trial, but whatever else it is, it's not an anti-trust relevant market. Now, would you agree that if there had been evidence of cross-elasticity of demand, such as, for example, evidence that it was possible to raise the price on the wheel game by 10% without losing any significant amount of your market, would that be enough to establish a triable issue for a relevant market being wheel games? If there was a relevant duration, so that it would have to be... Okay, for a year. Right. Yes, Your Honor, that would be, but there's nothing like that. Why isn't the price erosion fully equivalent to the cross-elasticity of demand? Because the price erosion, again, when you're talking about a differentiated market, and this is the cellophane case in the Supreme Court, the consolidated can case, when you're talking about the super premium ice cream case out of the 1930s, when you're talking about a differentiated product market, one would expect that if you have a premium product, upon entry, for there to be some price drop. Say I'm Colgate, and I decide I'm going to invent adding whitener to toothpaste. And I'm the first one to do it. And I can charge more for that, because I have this toothpaste with a special feature that people like, got whitening. Well, Parker & Gamble is going to have... They're going to come along, and they're going to put whitening in their toothpaste, and then they're going to turn the market. So for that time when I'm the first one, I'm going to be able to charge more. And when they enter the market, you're going to expect my price to drop. But that doesn't mean there's a separate antitrust market for toothpaste with whitening. All it shows is that in the spectrum, along the spectrum of toothpaste products, those two are competing. And if I had a patent, if I were Colgate and I had a patent on the whitening, and I could sue them for selling an infringing product, you might have a one-to-one panic damage claim. But suppose that, to take your example, suppose that the competing company hasn't developed a whitening feature, whatever it is, and it turns out that your whitening feature is very popular. In fact, you say, whoa, we can really make a killing on this, and you raise the price 40% on your whitening toothpaste, and you don't lose any market. You don't lose any market share. Isn't that exactly the kind of proof that would be sufficient to establish that whitening toothpaste is a sub-market? It might be, but there's absolutely no evidence here that we were charging a super-competitive price before they entered the market. Well, that is a way of saying that the price went down when there was competition. Isn't it a fair inference that the higher price was super-competitive because we know the lower price was competitive, or at least we can assume it was? No, Your Honor. Under economic theory, if you're in a differentiated product market where something like super-premium ice cream, Haagen-Dazs and Ben & Jerry's are competing on one spectrum. If Haagen-Dazs is there alone in that area of the spectrum, and then Ben & Jerry's comes in, you can expect Haagen-Dazs to reduce their prices as a result of Ben & Jerry's. But it doesn't mean that the super-premium ice cream doesn't compete with all ice creams, and that at some price level, people wouldn't move. So at most, all they've established with the price drop, and I'd like to say I don't think they've established a price drop, but if you assume that they've established a price drop, at most all they've shown is that real games compete with one another. But that's not enough to let a jury decide that real games compete only with real games and that they're their own market. If I could address the evidence that they point to more in their reply brief than they did in their opening brief. Sure, that would be helpful. Yes. Table 1, I'd encourage the court to look at the backup to their expert supplementary report. It's at A25064. Do you know what tab that might be? Yes, sir. It's at tab 87. 87, thank you. While you all are looking, I'll get the lead in. In their reply brief, they say that we didn't respond to their point, and I apologize for that. I didn't appreciate they were making this point in their opening brief, that their expert has shown a price drop on all of our customers, a significant price drop. And all the declaration says is that there's been a price drop, an average price drop over a range of multiple years. But when one looks at the actual supporting detail, which is at A25064, you'll see the relevant column is the far right column, the IGP-covered real gains. And what their expert says is the relevant numbers, so I'll work with his numbers, is the bottom half of the chart, which is the effective prices rather than the risk side. So if you see, they entered the market in November of 2002. Under their theory, our prices should have dropped upon their entry. But, in fact, they don't. They go up. Valiance enters in 2002. So in 2003, you see, for example, the LEAF 7154 in 2003. Our effective price then went up in 2004. And it went up again in 2005. And the same with participation. It went up for one year. It was up in 2004. And then, somewhat anomalously, it went down in the contribution. Their theory isn't backed up. He's only able to say that our prices dropped over that range of years by averaging it together. But if their theory is right, you would expect that our prices would have dropped immediately upon their entry, but they did not. So even if one thought a price drop was relevant, which I don't, or was enough to get you to jury, which I do. But that's really the question. I mean, it has to be relevant, right? It's relevant, yes, Your Honor.  And they don't have anything, as I said at the beginning. What the Supreme Court test is looking for in Brown v. Shoe is a reasonable interchangeability. It's a boundary. They have no boundaries. They can't draw the boundary around wheel games. All they can establish is that wheel games compete with one another. But this is a differentiated product market along a spectrum, just like super-cream and ice cream. And sure, Ben & Jerry's competes with Haagen-Dazs, but it also competes with Steel Test and Breyers and everybody in between. And so they don't have any evidence to get a boundary around wheel games. And how could, right? I mean, that's where I understand your point. I'm having a hard time. Let me tell you what's troubling me about this, and you can address it. I'm having a hard time distinguishing between, let's say, a sub-market in hybrid vehicles, where we can intuitively think that there's a class of people that really want to buy a hybrid vehicle, let's say an electric car, to make it even easier, who really want to buy an electric car. My gosh, they will pay $40,000 for an electric car, that's really a Corolla that you plug in, or they'll pay $45,000. They're not going to be influenced by the increase in price. They're committed. That makes sense to say that that's a sub-market or a market. There may be another group of people out there who really, really think it's important to have heated seats in their car, and they will pay a huge premium for heated seats, and they're not going to be much influenced, obviously at the margins they will, but they're not much influenced about price discrepancies, if they can get those heated seats. That sounds much less compelling a case, but if the economic evidence is the same, why isn't that enough to establish there is a sub-market in heated seat cars? So, may use that intuition. You have to have proof of cross-elasticity of demand, you have to have proof of a SNP test, and they don't have that. So, that's your hypothetical, whole foods. Whole foods, there was evidence precisely of that, that the price went up and people wouldn't switch from their premium grocery store to a regular grocery store. So, that's the kind of evidence they need, and they don't have it. All they have is price differentials, Doesn't price erosion show that? I'm sorry? Doesn't price erosion demonstrate that? No, it doesn't, because that's just the price drop evidence. All that shows is that we do compete, that wheel games are within some market that competes, but it doesn't draw the boundaries around wheel games. So, it's back to the super premium ice cream, and you could assume, so you could also think super premium ice cream is, intuitively, super premium ice cream is its own market, right? But without proof of cross-elasticity, without the SNP test proof, you don't let that go to the jury. In whole foods, they have that evidence. Here, they don't. They don't have any evidence that if the price were to be raised a small but significant amount for a long period of time, people, the casinos wouldn't shift to other types of games. Looking at Mr. Troxell's testimony, for example, he's asked about price elasticity. He says it's not an important issue, but I interpret... I'm sorry, I should redirect you to the passage. That's at 13,520. May I? Sure. I'm sorry, it's tab... I'm not being very helpful here. It's tab 39. And that's volume... He says price elasticity is not a very important issue, and at first I thought, well, that means he's not addressing price elasticity. But if you read the rest of his testimony on 13,521, he seems to think that the reason it isn't important is because there was elasticity. There was no elasticity in this case, because what he says is, I didn't think price elasticity was an important issue. Skipping to 13,521, the wheel has such a demand and such drawing power from consumers that, and because of the pricing arrangement whereby the casino would still be making money, it seemed to me that the price elasticity was not the issue, i.e., my interpretation of that, correct me if my interpretation is wrong, is that he's saying there is no price elasticity. We can charge whatever we want, or pretty close. Is that a fair... No, I don't think you can infer that on the page before, in the sentence right before what you were reading, so line 18 to 21. He's asked, when I get into price elasticity, I'm reading from line 16, when I get into price elasticity issues and I feel I have to measure price elasticity, then I would invariably involve an economist who is experienced in calculating that price elasticity. And he did not do that in this case, no. So the rest of it is just complete supposition. But is it? Because he goes on after the passage I read and says price elasticity occurs when you have products that are of a nature that price is going to make a difference for the consumer, and whether or not they would move to a different type of product. In this case, the wheel was what they wanted. Well, that seems like he's saying I didn't have to inquire into price elasticity because there isn't any. Except, I think when you look in the context of this whole testimony, so back on, several pages back, on 13, 5, 10, you see all he did was assume that every time Bally sold a machine and a wheel, IGT would have sold that machine. I mean, the casino has voted. The casino said, I'm going to have a wheel. And all I'm doing is counting up those votes and saying, indeed, these are the casinos that want wheels. So I just think, no, I don't think you can infer from his testimony where he says he didn't do a price elasticity analysis that that would be evidence of price elasticity. Okay. I understand. Any other questions? Okay. Thank you. Thank you. We'll hear rebuttal now. I agree with your statement there about what Mr. Troxel was saying. And to the extent there's any disagreement, that's something that the jury should be able to determine. Meaning, Troxel has said there's ample evidence where Troxel is making statements about price elasticity and discussing this one-for-one replacement. These are facts that are now in the record the jury can take a look at and make a determination itself as to whether or not there's Williams or relevant market. Same thing with the price erosion information that we provided. Same thing with the SNF test. And in fact, IGT was incorrect when it said that there was not any evidence other than the expert testimony. Ron Rivera, their head of sales, said specifically, and this is in the record, he said that they got pressure before to lower their wheel game prices by all of their customers, but it was not until Valley had a wheel game and they were able to then say, hey, if you don't lower your prices, we'll put in a Valley Monte Carlo wheel game. It wasn't until then that IGT was forced to lower its prices. And so while I agree that the document that there might be some fluctuation as to when the price erosion was at a peak in a market, I mean, markets fluctuate, IGT themselves relied on that evidence to argue for over $60 million in price erosion damages based on that same entry into that same market. And the boundaries were in fact created. They were created by IGT. As you recall, it's not the case that you always have a situation where a patent gives rise to a market, but where you have somebody who is zealously trying to protect the space by allegations excluding competitors from that space by litigation and by tying them up in agreements. Because of the fact, by their own admission, they had stumbled onto the most profitable slot machine ever based on its feature being a wheel, which is, by the way, a game chance. A wheel's been around for a long time, I think, in the gambling world. Then you do have a market where you've identified it clearly based on the efforts to preserve it, the clear ability to charge super competitive pricing, the impact of price erosion on it, and the analysis that Dr. Adams gave is the most nearest substitute, which was a premium bonus reels game where it has a secondary feature, which was the reels instead of the wheels. And his analysis showed that in that instance, the same type of game, there was not price erosion when Bally's wheel entered the market. Isn't it the case, as Ms. Maynard suggested, if you have a novelty feature of a product in a highly competitive market, I say that you will get a price opportunity bump while the novelty remains a novelty. And then as soon as everybody else adopts it, your price comes down. I mean, the example of cupholders that go even sillier than heated seats. You could, cupholders presumably cost a car manufacturer almost nothing to install, but you might get a few hundred extra bucks from people that just like having a bunch of cupholders in their van. That would, presumably, the first company that put in cupholders would be able to charge a premium and it would come right down as soon as somebody else put in cupholders. But it's strange to think of there being a sub-market of cupholder-equipped vans, don't you think? Potentially, but consumers are strange. I think that the point here is... Well, that has not so much to do with the strangeness of the consumers. It has more to do with the way markets operate when somebody brings in a novelty. This is the point that Ms. Maynard was making with the toothpaste. But I don't agree here that this is what we're talking about is novelty. I mean, you're talking about something that at least one company went to great lengths to seek a patent on and paid $164 million for those patents. We're talking about a feature that was touted as the most successful and innovative that there is. The concept of a spinning wheel like a roulette wheel, like a game of chance. When you add it to something in the casino space, it's a very defined thing. I think the economic evidence shows Ron Rivera's testimony, Troxel's testimony, that customers, when they wanted a wheel, they had to have a wheel. And the point here is that there were no competitors in the market because ITT excluded them. And it wasn't until their patents that were now known to be invalid. And it wasn't until Bally came in with another wheel that we saw the decline in prices. And the point here is just simply that all of this, at best, is just conflicts in evidence. And the jury should be deciding that. Very well. Thank you. We thank both counsels in both cases for a very helpful argument. And the case is submitted.